940 F.2d 1538
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a corporation,
and Broadcort Capital Corp., a corporation,
Plaintiffs-Appellants,
v.
MORAD COMPANY, Henry D. Moyle, Jr., Henry D. Moyle, III, and
Winfred M. Rahde, Defendants-Appellees.
 Nos. 90-4038, 90-4061.
 United States Court of Appeals, Tenth Circuit.
 Aug. 1, 1991.
 
 Before TACHA and SETH, Circuit Judges, and BRATTON, District Judge*.
 ORDER AND JUDGMENT**
 SETH, Circuit Judge.
 
 
 1
 Appellant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) mistakenly made two $76,887.00 transfers from the personal securities account of Henry D. Moyle, Jr. (Hank) into the brokerage account of appellee Morad Company (Morad). Only one such transfer was authorized. Morad, a corporation being formed by Hank, his son Henry D. Moyle, III (Henry) and Hank's son-in-law Winfred M. Rahde (Rahde) (all named defendants), spent the $76,887.00 before appellant learned of its mistake.
 
 
 2
 Merrill Lynch, and its wholly-owned subsidiary Broadcort Capital Corp., brought this diversity suit in district court to recover $76,887.00. Merrill Lynch alleged that the money was unlawfully converted by appellees, or in the alternative that appellees were unjustly enriched, and that appellees were jointly and severally liable for the resulting loss. The case was referred to a magistrate judge who recommended that the court grant summary judgment to Merrill Lynch. The district court rejected the magistrate judge's recommendation and granted summary judgment for appellees. The court found the conversion doctrine inapplicable and held that application of the unjust enrichment doctrine would not restore the parties to the status quo. For the reasons that follow, we reverse.
 
 
 3
 The facts are undisputed. Hank, Henry and Rahde created Morad to invest in stock and to buy and sell Saab automobiles. The three founders attempted to create Morad as a corporation. Articles of Incorporation were signed at an organizational meeting on February 24, 1988. The Articles, however, were not filed with the Utah Department of Business Regulation until August 9, 1988--well after the events pertinent to the present lawsuit.
 
 
 4
 On February 16, 1988, prior to Morad's organizational meeting, Hank opened a stock brokerage account at Paulson & Company under Morad's name. Sheldon Jones, a broker at Paulson, set up the account. On February 23, 1988, Rahde ordered the purchase of 8,000 shares of Research Industries, Inc. stock for the Morad account. Sometime in March 1988, an additional 10,000 shares of Research Industries stock were ordered for the Morad account. The total cost of the 18,000 shares was $76,887.00.
 
 
 5
 Rahde wrote two checks to pay for the original 8,000 share stock order. Both checks were dishonored. Jones contacted Hank, vacationing in Hawaii, and informed Hank that Morad would have to cover the loss for the purchase of the stock if the stock was not paid for. Hank agreed to pay for the stock out of his personal funds.
 
 
 6
 Hank telephoned Merrill Lynch from Hawaii and had it immediately wire transfer $76,887.00 from his personal account to Morad's Paulson account. Merrill Lynch asked Hank to write a letter authorizing the transfer when he returned to Salt Lake City.
 
 
 7
 At the end of his vacation, Hank wrote the letter Merrill Lynch requested. A Merrill Lynch employee, however, mistook the writing as a request to wire an additional $76,887.00 from Hank's personal account to Morad. The second wire was sent on April 6, 1988. As a result, Morad's account had a credit of $76,887.00.
 
 
 8
 Jones discovered the credit sometime prior to May 9, 1988. Jones contacted Hank and told him about the credit, although Jones stated that he did not know where it came from. Jones told Hank that one possible explanation for the extra money in the account was that Rahde's checks, written to purchase the stock, had cleared.
 
 
 9
 Hank then contacted Rahde and informed him of the credit. Rahde arranged with Jones to have the money transferred to a different Morad account at Zions First National Bank. That same day, Rahde wrote a check to "cash" for $76,000.00, co-signed by Henry. Two signatures were required to withdraw funds from the Morad account. The bank then issued three cashiers checks totalling $76,000.00 which Rahde used to satisfy personal debts. There was no evidence in the record that the second $76,887.00 was used by Hank or Henry.
 
 
 10
 Around May 18, 1988, Merrill Lynch mailed a monthly statement to Hank which reflected the two $76,887.00 transfers from his personal account. Hank notified Merrill Lynch of its mistake and received a $76,887.00 credit--money debited from the Morad account at Paulson without permission from Paulson. Paulson protested and subsequently agreed to assign its claim for recovery to Merrill Lynch and Broadcort. Broadcort was a Merrill Lynch subsidiary with whom Paulson associated.
 
 
 11
 On June 16, 1988, Rahde declared bankruptcy. His bankruptcy filing resulted in a stay of this action against him. Accordingly, Merrill Lynch seeks to recover from Morad, Hank and Henry.
 
 
 12
 In reviewing the district court's grant of summary judgment to Morad, we review the record and any possible inferences from the record in the light most favorable to the party opposing the motion. Boren v. Southwestern Bell Telephone Co., 933 F.2d 891, 892 (10th Cir.). Civil Procedure Rule 56(c) states that summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." To avoid summary judgment there must be sufficient evidence from which a jury could find for the plaintiff. Reazin v. Blue Cross and Blue Shield of Kansas, 899 F.2d 951, 979 (10th Cir.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249). We review all legal questions de novo. Sierra Club v. Lujan, 931 F.2d 1421, 1423 (10th Cir.).
 
 
 13
 Because this is a diversity case, our de novo review is based on the substantive law of Utah. Shute v. Moon Lake Elec. Ass'n, Inc., 899 F.2d 999, 1001 (10th Cir.) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64). We begin with appellant's argument that Morad, Hank and Henry were unjustly enriched.
 
 
 14
 Under Utah law, a successful action for unjust enrichment requires three elements:
 
 
 15
 "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."
 
 
 16
 Berrett v. Stevens, 690 P.2d 553, 557 (Utah). Assuming these elements are met, the remedy is restitution, an equitable relief. See Knight v. Post, 748 P.2d 1097, 1101 (Utah App.).
 
 
 17
 The district court held that equity would not be served if Hank and Henry were required to pay back the $76,887.00 to Merrill Lynch. The court did not directly apply the Berrett test, opting instead to analyze the facts of the case under the "changed circumstances" defense defined in Restatement, Restitution Sec. 142. It states:
 
 
 18
 "The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution."
 
 
 19
 The court reasoned that Hank and Henry Moyle in effect never received a benefit from the accidental transfer of the money. The court refused to equate the benefit Rahde received by paying his debts as a benefit to Morad or the Moyles. Essentially, the court viewed Hank and Henry's transfer of the money to Rahde as an innocent transaction. Requiring Hank and Henry to pay back the money would not return the parties to the status quo.
 
 
 20
 The district court's analysis, while equitable on its face, ignores the relationship of the parties in the present suit. The court erred by effectively eliminating Morad from its analysis and focusing on Hank, Henry and Rahde as individual actors. The benefit Morad, and therefore Hank, Henry and Rahde, received when Merrill Lynch mistakenly transferred the funds into the Morad account was the right to control $76,887.00 which was not theirs. Hank actively participated because he called Rahde and alerted him to the extra money in the account. Henry co-signed the $76,000.00 check releasing the money. These were decisions made by Hank and Henry acting in their capacity as members of Morad, not as individuals. Without Hank and Henry's affirmative actions resulting in the release to Rahde, the money would still be in the Morad account.
 
 
 21
 Once a benefit is found, however, the question remains whether the "change of position" defense used by the district court is applicable. The district court relied heavily on Bank Saderat Iran v. Amin Beydoun, Inc., 555 F.Supp. 770 (S.D.N.Y.), to support its finding of no unjust enrichment.
 
 
 22
 In Bank Saderat Iran, a bank was denied recovery for money it accidentally transferred into the account of one of its customers. The recipient of the money acted on the assumption that the money was for a textile shipment, and sent a textile shipment to a third party. The third party after receiving the textile shipment, declared bankruptcy. The court held that because recovery against the third party was impossible, it would be unjust to require recovery from the customer who initially received the money. Id. at 774.
 
 
 23
 The district court stated that "[t]he case at bar bears a striking resemblance to Bank Saderat Iran and fits squarely within the parameters of the Sec. 142 changed circumstances defense." The court apparently equated the bank customer in Bank Saderat Iran with Hank and Henry and the third party with Rahde. Several key differences between the facts here and the facts in Bank Saderat Iran make such a comparison incorrect.
 
 
 24
 First, Rahde was not a "third party" on whom Hank and Henry innocently conferred a benefit. He was their business partner and one of the three members of Morad. Second, Hank and Henry were not "innocent parties" in the scheme. Both took affirmative actions which allowed Rahde to withdraw $76,000.00 from the Morad account to spend as he pleased. While they most likely never imagined that their business partner and relative would use money which was not his to satisfy personal debts, this ignorance cannot be equated with innocence for purposes of the changed circumstances defense.
 
 
 25
 Hank and Henry made a conscious decision to enter into a business relationship with Rahde and they must live with the consequences of that decision. Had Morad decided to keep the money in its account or use the money to purchase additional Saab cars there is no question that Morad would be required to pay the money back. Morad's decision to "blindly" give $76,000.00 to Rahde to do whatever he wanted with it is no different. Under these circumstances, equity will not permit Morad, and therefore Hank and Henry, to escape the consequences of the company's decision to release the money to Rahde.
 
 
 26
 We have studied the issues raised in the remaining arguments, but conclude that we need not comment on them in light of our finding that Morad was unjustly enriched.
 
 
 27
 The judgment of the United States District Court for the Central District of Utah is REVERSED and REMANDED for further proceedings consistent herewith.
 
 
 
 *
 Honorable Howard C. Bratton, United States District Judge for the District of New Mexico, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3